**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| EDWIN DAVILA,<br>Plaintiff<br><br>v.<br><br>REYNALDO GUEVARA, *et al.*,<br>Defendants | No. 23 CV 1739<br><br>Judge Jeremy C. Daniel |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on Defendants Reynaldo Guevara and the Chicago Police Department's motion for summary judgment on Plaintiff Edwin Davila's claims under § 1983 of the Civil Rights Act of 1871 for violations of the Fourth and Fourteenth Amendments for conspiracy, and under various Illinois statutes related to Davila's arrest and conviction for the murder of Jaime Alvarez. (*See generally* R. 225.) The defendants assert they are entitled to summary judgment because (1) Guevara's invocation of the Fifth Amendment is not evidence for summary judgment purposes, (2) he had probable cause to arrest and detain the plaintiff, (3) witnesses made independent affirmative identifications of the plaintiff as the suspect, (4) certain state law claims are time-barred, (5) there is not enough evidence to meet the standards governing the state law claims, and (6) he is entitled to qualified immunity. (*Id.*) For the reasons below, the motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions,[1] the materials cited therein, and other aspects of the record in this case.

### I. THE INCIDENT

In the early morning hours of July 2, 1995, Michael Ybarra drove his 1986 Volkswagen Jetta on North Ashland Avenue with Jaime Alvarez in the passenger seat and Ivar Velasco in the back seat. (Pl. Resp. to Def. SOF ¶ 7.)[2] Ybarra, Alvarez, and Velasco had been drinking alcohol and smoking marijuana. (Def. Resp. to Pl. SOF ¶ 1.) While stopped at West Blackhawk Street and Ashland, Ybarra and Velasco observed a group gathered in front of Duk's Restaurant who flashed gang signs and yelled "King Killer," "Disciples," and other gang-related statements. (*Id.* ¶ 2.) Ybarra and Alvarez shouted, "Fuck you," after which a white Buick pulled up alongside Ybarra's car and threw glass beer bottles at the vehicle. (*Id.* ¶ 9; Def. Resp. to Pl. SOF ¶ 3.) Ybarra got angry and wanted to record the license plate number, so he began to follow the white Buick westbound onto West Pierce Avenue. (Def. Resp. to Pl. SOF ¶ 4.) The white Buick pulled in front of Ybarra's car and blocked it. (*Id.* ¶ 5.) Additional people emerged and began to throw food and other items at it. (*Id.* ¶ 6.)

[1] Defendants' Statement of Undisputed Material Facts ("Def. SOF") (R. 223); Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("Pl. Resp. to Def. SOF") (R. 245); Plaintiff's Statement of Additional Facts Pursuant to Local Rule 56.1(B)(3)(c) ("Pl. SOF") (R. 239); Defendants' Response to Plaintiff's Statement of Additional Facts ("Def. Resp. to Pl. SOF") (R. 250.)

[2] For ECF filings, the Court cites to the page number(s) in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

Shots were then fired into Ybarra's car, striking Ybarra (who survived) and killing Alvarez. (*Id.* ¶ 7.)

## II. YBARRA AND VELASCO'S INTERVIEWS

Ybarra drove to St. Mary's Hospital; Chicago Police Department officers Marco David and Tammie Pena spoke with Ybarra and Velasco there. (Pl. Resp. to Def. SOF ¶ 12.) In that interview, Ybarra and Velasco both told the officers they heard shots but did not see who the shooter was. (Def. Resp. to Pl. SOF ¶ 14.) Later in the morning, Detectives Thomas Fallon and Harry Collins interviewed Ybarra, but Ybarra had to cut the interview short to go into surgery. (*Id.* ¶ 13.) In his interview, he stated that occupants of a white vehicle threw a bottle at his car, that he followed the vehicle until it stopped, and that people on the street then threw objects at his car before someone began shooting. (*Id.* ¶ 14.) He stated in that interview that he did not see who did the shooting. (*Id.*; Def. Resp. to Pl. SOF ¶ 17.) Both Fallon and Collins spoke to Velasco, who said he heard gunshots in succession but also did not see who fired the shots. (Pl. Resp. to Def. SOF ¶ 15.) Fallon, Collins, and Velasco all drove the route that Ybarra had described. (*Id.* ¶ 16.)

Detective Ernest Halvorsen then interviewed Ybarra on the night of July 2 at the Cook County Hospital trauma unit. (*Id.* ¶ 18.) Again, Ybarra said he did not see the driver of the white Buick's face but described the front-seat passenger as a white Hispanic male, approximately twenty to twenty-five years old, with short brown hair brushed back and with a goatee and mustache. (*Id.* ¶ 20; Def. Resp. to Pl. SOF ¶ 20.) On July 9, Detectives Halvorsen and Guevara interviewed Velasco, during which

Velasco identified the offender's vehicle as a 1988 Buick Regal out of a vehicle identification book. (Pl. Resp. to Def. SOF ¶¶ 24–25.)

After interviewing Velasco, Guevara and Halvorsen noted in a police report that they spoke with some children in an alley near the scene of the shooting who had heard that a Latin Jiver committed the shooting. (*Id.* ¶ 27.) The children gave Guevara a list of suspect names—Cubano, Charlie, Toby, Jimmy, Joey, and Willie/Pee Wee—and said that Cubano was most likely the shooter. (*Id.*) Guevara and Halvorsen did not receive any identifying information from the children, nor is there evidence that they took notes of the interactions. (*Id.* ¶¶ 27–28.) They also did not interview any of the people named by the children or investigate whether those names were linked to the plaintiff in any way. (Def. Resp. to Pl. SOF ¶¶ 27–28.) Guevara then sought the information of five adult men near Pierce and North Paulina Avenue, one of whom was Davila. (Pl. Resp. to Def. SOF ¶ 29.) The plaintiff told them that he lived on North Cleaver Street. (*Id.* ¶ 31.) Guevara and Halvorsen noted during the interaction that the plaintiff had a tattoo identifying him as a Jiver. (*Id.* ¶ 32.)

On July 11, Guevara and Halvorsen presented to Ybarra a photo array consisting of the five men while Ybarra was at the hospital. (*Id.* ¶ 34.) Ybarra identified the plaintiff as the shooter. (*Id.* ¶ 35.) On July 13, Guevara and Halvorsen presented Velasco with the same photo array, and Velasco, too, identified the plaintiff as the shooter. (*Id.* ¶¶ 39–40.)

### III. THE PLAINTIFF'S ARREST AND SUBSEQUENT LINEUP IDENTIFICATION

On July 29, Officers Frank Vukonich and Alan Pergrande arrested the plaintiff for the murder of Jaime Alvarez and the attempted murder of Michael Ybarra and

took him to Area 5 (the regional policing command for the Chicago Police Department's Area 5 districts). (*Id.* ¶ 44.) The plaintiff has alleged that after his arrest, Guevara told the plaintiff that he would put him in a lineup and that he would be identified regardless of whether he was at the scene or committed the crime. (*Id.* ¶ 45; Def. Resp. to Pl. SOF ¶ 56.)

On July 30, Officers William Johnston and Stephen Gawrys conducted a lineup with the plaintiff and three fillers. (*Id.* ¶ 48.) At that lineup, Ybarra and Velasco both identified the plaintiff as the shooter. (*Id.* ¶ 49.) The parties dispute whether Guevara was present at this lineup. (*Id.* ¶ 50.) The plaintiff maintains that Guevara met with Velasco and Ybarra before the lineup. (*Id.*)

According to the plaintiff and based on the 2025 depositions of Ybarra and Velasco, Guevara pressured Ybarra and Velasco to identify the plaintiff as the shooter. (*Id.* ¶¶ 52, 54.) Specifically, Guevara told Ybarra to pick the plaintiff and pointed at the plaintiff's photo saying, "That is—isn't this the guy right here?" (*Id.* ¶ 51.) He also testified in 2025 that "Guevara was persistent about he was the shooter" and that he "wasn't sure if it was him, but they're telling me it was him." (Def. Resp. to Pl. SOF ¶ 43.) Ybarra felt like he needed to stick with this story, both at the lineup and at trial, lest Guevara "put a case on" him or harm his family. (Pl. Resp. to Def. SOF ¶¶ 52, 61.)

Guevara also pressured Velasco to identify the plaintiff as the shooter because "he had a determination" that the plaintiff was the shooter, and he told Velasco to "go with the flow" in making that identification. (*Id.* ¶¶ 53–54.) Velasco, however,

testified in 2025 that he did not see the shooter and told as much to Guevara repeatedly. (Def. Resp. to Pl. SOF ¶ 49.) He felt like he "was being coached and being advised . . . or being pressured to . . . add an image to something that [he] didn't see." (*Id.* ¶ 50.) Velasco said Guevara told him that the plaintiff was dangerous to society and that he should not be walking the streets. (*Id.* ¶ 51.)

## IV. Felony Review and Grand Jury Testimony

On July 31, Cook County Assistant State's Attorney (ASA) Michael Cawley interviewed witnesses. (Pl. Resp. to Def. SOF ¶ 57.) The parties dispute whether he reviewed police reports as well. (*Id.* ¶ 61.) The plaintiff, at the advice of his then-attorney, John Klunk, did not make a statement to ASA Cawley or any other officer. (*Id.* ¶ 58.) ASA Cawley interviewed Ybarra and Velasco separately and found both to be credible. (*Id.* ¶¶ 59–60.) At that point, ASA Cawley approved the charges of murder and attempted murder against the plaintiff. (*Id.* ¶ 61.)

On August 18, ASA Garfinkel presented the plaintiff's case to a grand jury. (*Id.* ¶ 61.) The plaintiff was indicted for first degree murder, attempted first degree murder, aggravated battery with a firearm, aggravated battery with great bodily harm, aggravated battery on a public way, aggravated discharge of a firearm, and armed violence. (*Id.* ¶ 62.) Guevara testified at this grand jury proceeding that he investigated and learned that the plaintiff shot Alvarez and Ybarra and shot toward Velasco. (*Id.* ¶ 63.)

## V. Pre-Trial Proceedings

ASA Timothy Tomasik, another ASA assigned to the plaintiff's prosecution, met with Ybarra and Velasco before trial. (*Id.* ¶ 66.) Tomasik reported that when he

asked Ybarra and Velasco why they did not identify the plaintiff the day of or after the shooting, they responded that they feared retaliation, but the plaintiff disputes this. (*Id.* ¶¶ 67–68.) Tomasik also testified that he was "sure [he] talked to [Guevara] after [he] got the case" about the fact that an eyewitness identification was not made immediately following the shooting, where Guevara also said that Ybarra and Velasco feared retaliation—another fact the plaintiff disputes. (*Id.* ¶ 70.) Velasco expressed anxiety at the prospect of testifying, especially in light of Guevara's pressure and involvement. (*Id.* ¶ 71.)

## VI. The Plaintiff's Trial

The plaintiff's state court bench trial began on March 20, 1996. (*Id.* ¶ 78.) In its case-in-chief, the State called as witnesses Alvarez's sister, Ybarra, Velasco, Guevara, and Vukonich, and the parties stipulated to the testimony of Cook County Medical Examiner forensic pathologist Dr. Lifschultz. (*Id.* ¶ 79.) When the State examined Ybarra, he identified the plaintiff in open court as the shooter. (*Id.* ¶ 82.) He also testified regarding his identifications of the plaintiff out of the photos presented to him on July 11 and the July 30 lineup and made yet another identification of the plaintiff in a lineup photo. (*Id.* ¶¶ 83, 85.) Velasco, too, testified regarding his identification of the plaintiff in the July 13 photo array and the July 30 lineup. (*Id.* ¶¶ 90, 92.) He also testified that on July 9, he identified the 1998 Buick Riviera as the type of vehicle involved in the shooting. (*Id.* ¶ 88.)

Guevara then testified to the following: while investigating the shooting on July 9, he and Halvorsen went to the corner of Pierce and Paulina and spoke with a group of children. (*Id.* ¶ 95.) They then toured the area and saw the plaintiff and

another person loading a stereo into a car on Pierce. (*Id.* ¶ 96.) Guevara told the men he was trying to locate information about the incident. (*Id.* ¶ 97.) He conducted five interviews, including with the plaintiff, and collected the interviewees' information. (*Id.* ¶ 98.) After the interviews, he ran a name check and obtained photos of the men and used them in a photo array. (*Id.* ¶ 99.) On July 11, he brought five color photos to Ybarra and asked him if he recognized anyone, and Ybarra pointed out the plaintiff as the shooter. (*Id.* ¶ 100.) On July 13, he did the same with Velasco, who also identified the plaintiff as the shooter. (*Id.* ¶ 101.) After Guevara's testimony, Vukovich testified that on July 19, he placed the plaintiff under arrest and noticed a Jiver tattoo on the plaintiff's shoulder during the arrest. (*Id.* ¶ 104.)

The plaintiff moved for a directed finding, which was denied. (*Id.* ¶¶ 106–07.) After closing arguments, the judge concluded that the State's witnesses were credible and found the plaintiff guilty of first-degree murder of Alvarez and attempted first-degree murder of Ybarra. (*Id.* ¶¶ 108–09.)

### VII. POST-TRIAL PROCEEDINGS

Before sentencing, the plaintiff moved for a new trial, asserting there was new evidence after two witnesses, Carlos Cotto and Christopher Lorenzi, contacted his attorney and stated that Phillip Willis was the shooter and provided affidavits. (*Id.* ¶ 110.) Cotto and Lorenzi presented these statements during an oral argument on the motion. (*Id.* ¶ 111.) The Illinois Appellate Court later affirmed the denial of the plaintiff's new trial motion in December 1997, finding that the trial court was correct that the newly discovered evidence was not likely to change the outcome of the trial. (*Id.* ¶ 115.) On April 17, 1996, the judge sentenced the plaintiff to fifty years in the

Illinois Department of Corrections for the murder of Alvarez and a concurrent sentence of six years for the attempted murder of Ybarra. (*Id.* ¶ 113.) The plaintiff moved the judge to reconsider the sentence, which was denied on August 8, 1996. (*Id.* ¶ 114.)

On February 20, 1998, the plaintiff filed a petition for post-conviction relief, arguing that his attorney provided ineffective assistance of counsel because he failed to discover additional witnesses Cotto and Lorenzi, along with the plaintiff's girlfriend Myriam Porras, whose testimony would have changed the outcome of the trial. (*Id.* ¶ 116.) On March 30, 1998, Judge Lon William Shultz denied the petition, finding that the claim was waived for not being raised on direct appeal and that the plaintiff's attorney's representation did not fall below an objective standard of reasonableness. (*Id.* ¶ 117.) On April 24, 1998, the plaintiff filed a notice of appeal of the denial. (*Id.* ¶ 118.) The Illinois Appellate Court affirmed the denial on July 16, 1999, finding that the affidavits from Porras, Lorenzi, and Cotto were discoverable prior to trial. (*Id.* ¶ 119.) The Illinois Supreme Court denied the plaintiff's petition for leave to appeal on December 1, 1999. (*Id.* ¶ 120.)

On September 14, 2000, the plaintiff filed a second petition for post-conviction relief with newly discovered affidavits from Pedro Carmona and Samuel Matias. (*Id.* ¶ 121.) Judge Shultz denied this petition as frivolous and lacking merit on November 29, 2000, finding that the plaintiff did not present new evidence, there was a lack of due diligence, and even this new evidence would not have changed the outcome at trial. (*Id.* ¶ 122.) After the plaintiff appealed based on actual innocence, the Illinois

Appellate Court again affirmed Judge Shultz's denial, finding that the Carmona and Matias affidavits were substantially similar to Lorenzi and Cotto's affidavits and that the plaintiff did not make a showing that the result at trial would have changed. It also found that the affidavit was not sufficiently conclusive to support a claim of actual innocence. (*Id.* ¶¶ 123–24.)

The plaintiff then filed a *pro se* petition for a writ of *habeas corpus*, arguing that (1) his trial counsel failed to adequately investigate information about a different shooter, call Lorenzi, Cotto, and Porras as witnesses, subpoena Porra's phone records, and adequately challenge Ybarra and Velasco's testimony; (2) Carmona and Matias' affidavits show actual innocence; (3) his trial counsel failed to present mitigating evidence at his sentencing hearing; and (4) the trial court erred when it dismissed his second state postconviction petition. (*Id.* ¶ 125.) On June 9, 2012, the plaintiff filed a *pro se* petition for relief of judgment because the court did not mention or impose a term of mandatory supervised release, which was denied. (*Id.* ¶ 126.) On August 23, 2022, the plaintiff filed a petition for relief from judgment, alleging that Guevara had a pattern and practice of misconduct unknown at the time of the original trial. (*Id.* ¶ 127.) On November 15, 2022, Judge Joanne Rosado granted the petition and vacated the plaintiff's convictions that day. (*Id.* ¶ 128.) On October 25, 2023, Judge Erica Reddick issued a certificate of innocence for the plaintiff. (*Id.* ¶ 129.)

## LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute of material fact exists if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, the Court draws all inferences in the light most favorable to the nonmoving party. *Id.* at 255. However, the nonmoving party cannot rely on mere conjecture or speculation to manufacture a genuine issue of material fact. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

## ANALYSIS

### I. COMPLIANCE WITH LOCAL RULE 56.1

The defendants argue in their reply brief that the plaintiff failed to comply with Local Rule 56.1 because many of his responses to the defendants' facts are argumentative. (*See generally* R. 244.) The Court agrees that the plaintiff's responses often veer into argument territory, especially when looking at the responses' length and numerous legal citations. (*See, e.g. id.* ¶¶ 36, 42.) That said, many of the facts in the defendants' Rule 56.1 statement are themselves argumentative in nature. (*Id.*) As an example, "there is no evidence that Guevara was involved in any illegally suggestive or coercive identification techniques[,]" (*id.* ¶ 43,) leans much closer to a legal conclusion than a factual statement. The Court reminds both parties that the rules regarding statements of fact require strict compliance and that they should save the argument for their respective briefs.

### II. FIFTH AMENDMENT

Guevara has invoked his Fifth Amendment right against self-incrimination. The defendants first argue that Guevara's invocation of the Fifth Amendment may not be taken as independent evidence for summary judgment purposes. (R. 225 at 10–

12.) In civil cases, a trier of fact may make an adverse inference against a defendant who invokes their Fifth Amendment right in refusing to testify. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 389 (7th Cir. 1995). The Seventh Circuit held in *Seguban* that at summary judgment, "although inferences based on the assertion of the privilege are permissible, the entry of judgment based only on the invocation of the privilege and 'without regard to the other evidence' exceeds constitutional bounds." *Id.* at 391 (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). Here, however, the plaintiff provides corroborative evidence that does not pin the sole weight of a potential judgment in the plaintiff's favor on Guevara's invocation of the Fifth Amendment.

## III. Fourteenth Amendment

The defendants next argue that they are entitled to summary judgment on the plaintiff's claims under the due process clause (Count I) because (1) Ybarra and Velasco made independent eyewitness identifications of the plaintiff, and (2) the plaintiff cannot bring a *Brady* claim for fabricated eyewitness identifications. (R. 225 at 12–26); *see Brady v. Maryland*, 373 U.S. 83 (1963).

### A. Fabrication of Evidence and Suggestive Identification Procedures

The Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). To show fabrication of evidence, a plaintiff must prove that the defendant "(1) knowingly fabricated (2) false evidence (physical or testimonial), (3) the false evidence was used against him in his

criminal trial, and (4) it was material to his conviction." *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020).

Here, the plaintiff presents evidence showing that the inclusion of the plaintiff in the lineup, as well as the composition of the lineup, were based on his and his home's proximity to the scene of the crime. (Def. Resp. to Pl. SOF ¶¶ 32–33.) Under the plaintiff's view of the facts, Guevara created his array from a canvas of the neighborhood near the crime scene and identified five Latino men to create a photo array. (*Id.* ¶ 34.) The parties do not dispute that the evidence was used against the plaintiff in his criminal trial and that it was material to his conviction. (*Id.* ¶ 68.)

Here, the plaintiff's evidence creates a genuine dispute of material fact as to the elements of intent and falsity of the evidence. CPD policy dictates that a photo array should be created using one suspect and fillers who match eyewitness descriptions of the suspect. (*Id.* ¶ 35.) Here, Guevara's creation of an all-suspect photo array appears to violate that policy. (*Id.*) While CPD policy alone is not probative of a federal constitutional violation, Guevara's supposed violation of CPD policy does bear on whether he knowingly fabricated the array to frame the plaintiff. And a reasonable jury could conclude that his pressure on Ybarra and Velasco to affirmatively identify the plaintiff meant that the evidence was false in nature. Ultimately, a determination of Guevara's mental state and the resulting identifications are subject to disputes of fact that must be resolved by a jury. The Court denies the defendants' motion for summary judgment on Count I as to fabrication of evidence.

As to the constitutionality of a suggestive identification process, the Seventh Circuit employs a two-step analysis. First, "the petitioner must demonstrate that the identification procedures were unduly suggestive." *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003). If they are, the court must determine the reliability of the identification, assessed under the following factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). Both steps are assessed under the totality of the circumstances. *Id.* The record is rife with disputes of material fact as to the veracity of the eyewitness identifications, disputes that will require resolution by a jury.

First, as to suggestive identification procedures, the plaintiff provides evidence that Guevara pushed Ybarra and Velasco to pick the plaintiff out of the provided lineup. Ybarra and Velasco have testified that Guevara pressured them by saying, "This is the guy. This is the guy. You already said he's—he jumped out and ran around. And so, this has got to be the guy." (Def. Resp. to Pl. SOF ¶ 42.) But Ybarra himself said, "I'm not sure if he was [the shooter]. I could not definitely say it was him. But Guevara was persistent about he was the shooter . . . . And I wasn't sure if it was him, but they're telling me it was him." (*Id.*)

The reliability of the identifications is also subject to dispute. Ybarra and Velasco testified that at the hospital immediately following the shooting, they told

the officers that they did not see who fired the shots, so the opportunity to view the suspect was limited. (*Id.* ¶ 14.) And they both testified that, during the lineup, they had said that the plaintiff was not the shooter but were told by Guevara to identify the plaintiff regardless. (*Id.* ¶¶ 42, 50.) This shows a dispute over the level of certainty demonstrated by the witnesses at the confrontation.

The defendants' conflicting evidence is that, ultimately, Ybarra and Velasco did independently and affirmatively identify the plaintiff as the shooter during the police lineup. (R. 225 at 13–14.) They argue that "[t]he uncertainties expressed by Ybarra and Velasco at their depositions nearly three decades later were most decidedly not about Plaintiff's involvement but rather whether they could discern if it was Plaintiff's hand that raised the gun from the area in which he was sitting in the car." (*Id.* at 14.) Whether it is the case that such uncertainties were "most decidedly" about anything and the import of those uncertainties are questions for the jury to resolve, not for this Court. It is clear that there are disputes of material fact over both the suggestiveness of the identifications and the reliability of such identifications. A reasonable jury may conclude that the uncertainties meant that Guevara pressured Ybarra and Velasco to identify the plaintiff in the lineup in violation of his due process rights.

The defendants are also not entitled to qualified immunity for Guevara's suggestive tactics. "Qualified immunity protects public officials from liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known." *Catlin v. City of Wheaton*, 574 F.3d 361, 365

(7th Cir. 2009). In *Blackmon*, the Seventh Circuit held that it was not clearly established that "a suggestive photo array or lineup by itself" could expose police officers to damages. *Blackmon v. Jones*, 132 F.4th 522, 526 (7th Cir. 2025) (emphasis omitted). Damages require "unusual circumstances" such as "defrauding the prosecutor or otherwise manufacturing evidence." *Id.* In fact, the circumstances of the factual dispute at play here are the exact situation the Seventh Circuit envisioned as an exception to its holding in *Blackmon*. *Id.* at 525–26. Taking all facts in favor of the plaintiff, the facts here do not show a mere "suggestive photo array or lineup" operating alone. They show a detective who could have manufactured identifications out of eyewitnesses at a police lineup. The Court accordingly denies the defendants' motion on Count I as to suggestive identification procedures.

### B. Exculpatory Evidence

Under *Brady v. Maryland*, a failure to turn over exculpatory evidence to a criminal defendant is a violation of due process. 373 U.S. 83 (1963). To show a *Brady* violation, the plaintiff must show that:

> (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the evidence must have been material, meaning there is a reasonable probability that the result of the proceeding would have been different.

*Beaman v. Freesmeyer*, 776 F.3d 500, 506 (7th Cir. 2015) (citing *Carvajal v. Dominguez,* 542 F.3d 561, 566–67 (7th Cir. 2008)). Here, the defendants argue that the plaintiff cannot prove a *Brady* violation because fabrication of evidence is not a "suppression" of evidence, especially under *Saunders-El v. Rohde*, 778 F.3d 556 (7th

Cir. 2015). (R. 225 at 23–26.) This is correct. The Seventh Circuit has held that compliance with *Brady* does not "compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El*, 778 F.3d at 562. Thus, to the extent that the plaintiffs present evidence regarding Guevara's fabrication of evidence insofar as his investigatory capacity is concerned, such evidence cannot sustain a claim under *Brady*. The Court grants the defendants' motion for summary judgment on Count I as to the plaintiff's *Brady* claim.

## IV. FOURTH AMENDMENT

The defendants next argue that the plaintiff cannot prove malicious prosecution (Count II) or unlawful detention (Count IV) because Guevara had probable cause to detain the plaintiff. (R. 225 at 26–32.) To prove malicious prosecution under § 1983, the plaintiff must show that:

> (i) the suit or proceeding was instituted without any probable cause; (ii) the motive in instituting the suit was malicious, which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution terminated in the acquittal or discharge of the accused.

*Neita v. City of Chicago*, 148 F.4d 916, 939 (7th Cir. 2025).

A plaintiff cannot state a malicious prosecution claim against an officer who investigates or pursues criminal charges with probable cause. *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009). An officer has probable cause "if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Gower v. Vercler*, 377

F.3d 661, 668 (7th Cir. 2004). The defendants argue that Guevara had probable cause because of "the statements and repeated identifications made by Ybarra and Velasco," and the grand jury's indictment of the plaintiff. (R. 225 at 28–29.)

When the underlying facts are in dispute, the question of whether probable cause exists is for the jury. *Braun v. Village of Palatine*, 56 F.4th 542, 549–50 (7th Cir. 2022). As discussed regarding fabrication of evidence and suggestive identification procedures, *supra*, there are numerous factual disputes regarding Guevara's interactions with Ybarra and Velasco that call into question whether a reasonable officer in his situation would believe that the plaintiff had, in fact, committed an offense. The grand jury indictment here rests on the very same fabricated evidence and identifications, so that indictment cannot be relied upon to confer probable cause to Guevara. *See Cervantes v. Jones*, 188 F.3d 805, 811 n.7 (7th Cir. 1999). Taking the facts in favor of the plaintiff, the Court finds that the existence of fabricated evidence and manufactured identifications means that the issue of Guevara's probable cause must, at the very least, be determined by the jury.

The defendants' arguments regarding the Cook County State's Attorney's Office's independent prosecutorial commencement and the existence of separate or independently developed information do not fare much better. (R. 225 at 29–30.) Because Ybarra and Velasco said that their pressured identifications influenced their testimony and subsequent answers to interview questions, Guevara's role in the commencement of the proceedings against the plaintiff remains in play, and the indictment does not break the chain of causation between Guevara's conduct and the

subsequent prosecution. *Colbert v. City of Chicago*, 851 F.3d 649, 655 (7th Cir. 2017). The role of Guevara's influence on any additional information that prosecutors gained regarding Ybarra and Velasco's identifications must be resolved by a jury.

Nor is Guevara shielded by qualified immunity for this conduct. Because the evidence here supports an inference of evidence fabrication in the criminal case, fabrication which was material to the finding of probable cause, the Court finds that Guevara is not entitled to qualified immunity. *See Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1154 (N.D. Ill. 2022) (citing *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008)); *contra Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 879–80 (7th Cir. 2012). The Court accordingly denies the defendants' motion for summary judgment as to Counts II and IV.

### V. Intentional Infliction of Emotional Distress

The defendants next argue that the plaintiff's claim for intentional infliction of emotional distress (IIED) (Count VII) is barred by Illinois' one-year statute of limitations on tort actions against local officials, which accrue at the time of arrest. (R. 225 at 32–33); 745 ILCS 10/8-101; *see also Bridewell v. Eberle*, 730 F.3d 672, 675 (7th Cir. 2013). However, under *Heck v. Humphrey*, 512 U.S. 477, 489–90 (1994), "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." In *Parish v. City of Elkhart*, the Seventh Circuit held that a claim for IIED, where the plaintiff's conviction is the "crux of the claim," is controlled by *Heck* and so accrues after the invalidation of the plaintiff's conviction. 614 F.3d 677, 683–84 (7th Cir. 2010). Here, the plaintiff's IIED claim rests on conduct by Guevara that was material

to the plaintiff's conviction. The defendants' reliance on *Bridewell* is inapposite because the plaintiff in that case was never convicted, so *Heck* was not at issue. *See Bridwell*, 730 F.3d at 675. Thus, the Court finds that the plaintiff was barred from bringing his IIED claim until after his convictions were vacated in November 2022. (Pl. Resp. to Def. SOF ¶ 128.) Because he brought the claim within one year after the vacaturs, it is within the statute of limitations.

The defendants' argument regarding probable cause is rejected for the same factual disputes recited under Section II, *supra*. And the Court finds that the plaintiff has presented sufficient evidence to show that Guevara's actions, which led to his conviction and incarceration for over twenty-four years, were extreme and outrageous and caused severe distress. *See Sun v. Xu*, 99 F.4th 1007, 1013 (7th Cir. 2024) (laying out IIED standard); *see also Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1172 (N.D. Ill. 2022) ("A finder of fact could reasonably conclude [a police detective] acted in an extreme and outrageous manner toward Mr. Brown by fabricating the court-reported statements of his co-suspects[.]"). Therefore, the Court denies the defendants' motion for summary judgment on Count VII.

## VI. REMAINING STATE LAW CLAIMS

The plaintiff has forfeited his claims for failure to intervene (Count III), § 1983 conspiracy (Counts IV and IX), and willful and wanton conduct (Count VIII). (R. 243 at 11 n.2.) The Court accordingly grants the defendants' motion for summary judgment as to those claims.

## VII. *RESPONDEAT SUPERIOR* AND INDEMNIFICATION

Finally, the defendants argue that they are entitled to summary judgment on the plaintiff's claims for *respondeat superior* liability and indemnification under Counts X and XI because those claims are derivative of the underlying merits claims. (R. 225 at 39.) They continue that Count X for *respondeat superior* liability should also be dismissed because such liability is available only through state law claims. (*Id.*) But because the Court has denied summary judgment on a number of underlying claims, including the state law IIED claim, the Court also denies summary judgment on Counts X and XI.

## CONCLUSION

The defendants' motion for summary judgment [225] is granted in part and denied in part. Specifically, it is granted as to Counts I (only as to the *Brady claim*), III, IV, VIII, and IX and denied as to Counts I (excluding the *Brady* claim), II, VI, VII, X, and XI.[3]



Date: August 17, 2026

JEREMY C. DANIEL
United States District Judge

[3] Count V was dismissed with prejudice on December 23, 2025, pursuant to the parties' stipulation. (*See generally* R. 213.)